**GOLDSMITH & MENDOZA P.L.L.C.**
1670 E. River Road, Suite 200
Tucson, Arizona 85718
Phone/Fax: (520) 497-1138
Eugene N. Goldsmith; eng@goldsmith-mendoza.com
ASB No. 010254
Maria del Pilar Mendoza; pm@goldsmith-mendoza.com
ASB No. 024740
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| JOSEPH BUXENBAUM, a single man individually,<br>　　　　Plaintiff,<br><br>v.<br><br>TRI-TAYLOR MANAGEMENT, INC., a Nevada Corporation, and GEOTEMPS, INC., a Nevada Corporation.<br>　　　　Defendants | NO.<br><br>**COMPLAINT FOR HOSTILE WORK ENVIRONMENT, QUID PRO QUO SEXUAL HARASSMENT, WRONGFUL TERMINATION, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**(Jury Trial Requested)**<br><br>**42 U.S.C. §§ 2000e et seq.** |

Plaintiff JOSEPH BUXENBAUM ("Mr. Buxenbaum") for his Complaint against Defendants TRI-TAYLOR MANAGEMENT, INC., a Nevada Corporation ("Tri-Taylor"), and GEOTEMPS, INC., a Nevada Corporation ("Geotemps"), (collectively "Defendants") alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Mr. Buxenbaum is a resident of Pima County, Arizona.

2. Tri-Taylor is a Nevada corporation, conducting business in Pima County, Arizona.

3. Geotemps was, at all times relevant, an Arizona corporation, conducting business in Pima County, Arizona.

4. According to Tri-Taylor's employment handbook, Tri-Taylor provides administrative and staffing support for Geotemps.

5. Tri-Taylor and Geotemps share common management.

6. Lance Taylor is the owner and President of both Tri-Taylor and Geotemps.

7. Sarah Lightner, as Tri-Taylor's Vice President of Corporate Operations, manages and supervises Tri-Taylor and Geotemps employees.

8. Tri-Taylor's and Geotemps' operations are interrelated.

9. Employees, including Mr. Buxenbaum, who are paid by Tri-Taylor, conduct work on Geotemp's behalf.

10. Employees, including Mr. Buxenbaum, who are paid by Tri-Taylor, hold themselves out in the community as working for Geotemps.

11. Tri-Taylor and Geotemps are parties to Mr. Buxenbaum's employment agreement.

12. Mr. Buxenbaum's performance review, conducted by Tri-Taylor, expressly reviews his work "with Geotemps".

13. Tri-Taylor's employment handbook describes Tri-Taylor's and Geotemps' interrelated operations, including Tri-Taylor's administrative and staffing support for Geotemps.

14. Upon information and belief, Tri-Taylor employs 20 or more employees.

15. Upon information and belief, Geotemps employs 20 or more employees.

16. All acts complained of herein were done by Defendants or by their authorized agents in the course and scope of their employment or agency.

17. Defendants directly and/or through their authorized agents or employees caused events to occur in Pima County, Arizona, which are the basis of this action.

18. Mr. Buxenbaum's cause of action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C, §§ 2000e *et. seq.*

19. This court has jurisdiction regarding this matter pursuant to 28 U.S.C.A. §1331, § 1367(a).

20. Venue in this Court is proper pursuant to 28 U.S.C.A. § 1391(b)(2) as this is the judicial district where the events or omissions giving rise to the claim occurred, and § 1391(b)(1), (c)(2), as Defendants reside in Pima County, Arizona.

## ADMINISTRATIVE PROCEDURES

21. On or about June 3, 2020, within 180 days of January 15, 2020 (Mr. Buxenbaum's termination), Mr. Buxenbaum filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"), against Geotemps.

22. Mr. Buxenbaum's EEOC Charge against Geotemps is identified by EEOC No: 540-2020-03264.

23. On September 21, 2021, the EEOC provided Mr. Buxenbaum a Notice of Right to Sue, regarding his EEOC Charge against Geotemps. Attached as **Exhibit 1** is that Notice of Right to Sue.

24. On or about June 9, 2020, within 180 days of January 15, 2020 (Mr. Buxenbaum's termination), Mr. Buxenbaum filed a charge of employment discrimination with the EEOC, against Tri-Taylor.

25. Mr. Buxenbaum's charge against Tri-Taylor is identified by EEOC No: 540-2020-03401.

26. On September 21, 2021, the EEOC provided Mr. Buxenbaum a Notice of Right to Sue, regarding his EEOC Charge against Tri-Taylor. Attached as **Exhibit 2** is that Notice of Right to Sue.

27. This action is timely commenced within 90 days of Mr. Buxenbaum's receipt of the EEOC's Notices of Right to Sue.

## GENERAL ALLEGATIONS

28. Mr. Buxenbaum realleges and incorporates by reference the allegations contained in the previous paragraphs.

### Mr. Buxenbaum's Employment with Defendants

29. Mr. Buxenbaum began working for Defendants on July 15, 2019, as a Regional Staff Manager in Defendants' Tucson office.

30. Mr. Buxenbaum's job duties included recruiting staff for job placement in the mining, geotechnical, and construction industries.

31. As part of his job duties, Mr. Buxenbaum traveled, within and out of Arizona, to attend conferences where he networked with industry clients and identified candidates for Defendants' clients.

32. Mr. Buxenbaum reported to Leslie Fair, Defendants' Southwest Regional Branch Manager, who worked in Defendants' Tucson office, and Sarah Lightner, Tri-Taylor's Vice President of Corporate Operations, who worked in Defendants' Reno, Nevada office.

<u>Ms. Lightner's Sexual Harassment at the Amigos Mining Reverse Expo</u>

33. On or about August 15, 2019, Ms. Lightner, Ms. Fair, and Mr. Buxenbaum met at Defendants' Tucson office to prepare for the Amigos Mining Reverse Expo ("Amigos Expo"), a networking conference in Flagstaff, Arizona.

34. Ms. Lightner, Ms. Fair, and Mr. Buxenbaum, then, traveled from Tucson to Flagstaff in Ms. Lightner's rental car.

35. Ms. Lightner, Ms. Fair, and Mr. Buxenbaum arrived at the Little America Hotel, in Flagstaff.

36. As they walked to their respective rooms, Ms. Lightner told Mr. Buxenbaum that he looked nice in jeans and button-down shirt, and that he should dress like that more often.

37. That comment made Mr. Buxenbaum uncomfortable and self-conscious.

38. That evening, Ms. Lightner, Ms. Fair, and Mr. Buxenbaum attended a networking mixer in the hotel.

39. After the networking mixer, Ms. Lightner, Ms. Fair, and Mr. Buxenbaum joined Defendants' prospective clients, Roy Smith and Ramon Gaanderse, at a bar.

40. While at the bar, Ms. Lightner flirted with Mr. Buxenbaum and attempted to hold his hand several times.

41. Ms. Lightner's comments and conduct made Mr. Buxenbaum uncomfortable.

5

42. Mr. Buxenbaum physically distanced himself from Ms. Lightner to avoid her sexual advances.

43. The following evening, on August 16, 2019, after returning to the hotel from a restaurant and bar with Defendants' prospective clients, Ms. Lightner, Ms. Fair, and Mr. Buxenbaum took a walk around the hotel's courtyard.

44. During that walk, Ms. Lightner stated that she had lost her earring, and asked Ms. Fair and Mr. Buxenbaum to help her look for it.

45. Ms. Lightner, then, pulled Mr. Buxenbaum to the ground and grabbed his hand.

46. Mr. Buxenbaum, in response, pulled away from Ms. Lightner.

47. Ms. Lightner, then, stated to Mr. Buxenbaum that he looked great in black.

48. Ms. Lightner's conduct and comments made Mr. Buxenbaum uncomfortable.

49. Ms. Fair witnessed Ms. Lightner's conduct and heard her comments to Mr. Buxenbaum.

50. During that interaction, Mr. Buxenbaum looked toward Ms. Fair to signal his discomfort.

51. Soon thereafter, Ms. Lightner, Ms. Fair, and Mr. Buxenbaum headed toward their respective rooms.

52. Mr. Buxenbaum walked ahead of Ms. Lightner.

53. Ms. Lightner, then, approached Mr. Buxenbaum from behind, reached around him, and cupped his penis.

54. Mr. Buxenbaum felt shocked, embarrassed, and violated.

55. As they continued to walk to their respective rooms, Ms. Lightner, again, approached Mr. Buxenbaum from behind and grabbed his buttocks.

56. Mr. Buxenbaum jumped in shock.

57. Mr. Buxenbaum immediately went to his room and shut the door, to make clear to Ms. Lightner that he was not interested in her sexual advances.

58. Ms. Lightner's conduct and comments upset Mr. Buxenbaum.

59. In addition, Mr. Buxenbaum feared that those advances would result in him losing his job, especially as Mr. Buxenbaum had been working for Defendants for only one month.

<u>Ms. Lightner's Harassment Continued During the Long-Distance Working Relationship</u>

60. Ms. Lightner continued to harass Mr. Buxenbaum after the Amigos Expo.

61. When Ms. Lightner tried to contact Mr. Buxenbaum, she was aggressive and always exhibited a sense of urgency, which she did not exhibit with other employees.

62. Ms. Lightner video called Mr. Buxenbaum on a nearly daily basis.

63. If Mr. Buxenbaum did not answer the video call, Ms. Lightner would call the Tucson office and his personal cell phone, and direct administrative staff to contact Mr. Buxenbaum, rather than leave a message, which she typically did with other employees.

64. Ms. Fair knew of Ms. Lightner's behavior toward Mr. Buxenbaum, and believed it to be unusual, compared to Ms. Lightner's interactions with other employees.

<u>Ms. Lightner' Sexual Harassment Continues at AEMA Mining Event</u>

65. On December 3, 2019, Mr. Buxenbaum flew from Tucson to Reno for a networking conference, the AEMA Mining Event.

66. Mr. Buxenbaum was anxious and stressed, because he worried that Ms. Lightner would harass him, as she did at the Amigos Expo.

67. At approximately 3:00 p.m., Mr. Buxenbaum arrived at the Reno airport, where Ms. Lightner picked him up and drove them to Defendants' Reno office.

68. Ms. Lightner had scheduled a six-month review of Mr. Buxenbaum to occur that day.

69. Ms. Lightner and Andrea Rascati, Defendants' human resources manager, attended the six-month review.

70. Ms. Lightner gave Mr. Buxenbaum a positive review.

71. Out of 15 categories provided on the review form, Ms. Lightner rated Mr. Buxenbaum's performance as average, above average, or outstanding in 13 categories.

72. After the review, Ms. Lightner and Mr. Buxenbaum traveled to the Nugget Hotel, in Reno, where the AEMA Mining Event was being held.

73. After checking into their hotel rooms, Ms. Lightner asked Mr. Buxenbaum to join her at a networking event in the hotel bar.

74. While at the event, Ms. Lightner told Mr. Buxenbaum that it had been a while since she had "been with a man" and that Mr. Buxenbaum would "be better than the dildo in [her] nightstand."

75. Ms. Lightner's comment made Mr. Buxenbaum extremely uncomfortable.

76. Mr. Buxenbaum's discomfort was so intense that he did not know how to respond and froze.

77. Mr. Buxenbaum looked at Ms. Lightner in silence and discomfort.

78. Mr. Buxenbaum's reaction clearly exhibited his discomfort, as Ms. Lightner hastily apologized, and stated that she "forgot" that Mr. Buxenbaum was not one of her clients.

79. Ms. Lightner, then, stated that she knew her comments were inappropriate.

80. Due to Ms. Lightner's misconduct, Mr. Buxenbaum did not want to be alone with Ms. Lightner and left the bar.

81. Mr. Buxenbaum, then, called Ms. Fair to report Ms. Lightner's comments.

82. Ms. Fair arrived at the Nugget Hotel at approximately 6:30 p.m.

83. Mr. Buxenbaum texted her around that time and asked her to "rescue" him, because he was not comfortable being alone with Ms. Lightner.

84. Mr. Buxenbaum felt that Ms. Lightner's harassment may worsen without Ms. Fair's presence.

85. Mr. Buxenbaum, then, met Ms. Fair at her hotel room, and they walked to the networking event.

86. Mr. Buxenbaum asked Ms. Fair to stay with him during the event, because he did not want to be alone with Ms. Lightner.

87. Ms. Fair knew that Mr. Buxenbaum was avoiding Ms. Lightner, because of her sexual advances toward him.

88. During the few minutes that Mr. Buxenbaum met with Ms. Fair and walked back to the networking event, Ms. Lightner texted him several times to ask where he went.

89. The following day, on December 4, 2019, Mr. Buxenbaum, his friends, and Ms. Fair went to dinner.

90. During that dinner, Mr. Buxenbaum and Ms. Fair discussed Ms. Lightner's sexual advances and inappropriate behavior.

91. Mr. Buxenbaum, again, told Ms. Fair that he felt very uncomfortable around Ms. Lightner, and wanted to avoid being alone with her.

9

92. When they returned to the Nugget Hotel, Mr. Buxenbaum saw Ms. Lightner at the hotel bar.

93. Mr. Buxenbaum, then, asked Ms. Fair if they could walk back outside, in the cold, to walk around the hotel's side entrance, to avoid Ms. Lightner seeing him.

<u>Employees Report Ms. Lightner's Misconduct to Ms. Rascati and Ms. Lightner</u>

94. On or about December 6, 2019, Jennifer Pardue, Defendants' employee, reported to Ms. Lightner that she heard that Ms. Lightner had inappropriately touched Mr. Buxenbaum.

95. On December 10, 2019, Leslie Aguirre, Defendants' employee, reported to Ms. Lightner and Ms. Rascati that Mr. Buxenbaum told her that Ms. Lightner had grabbed his penis.

96. Ms. Aguirre also reported that Ms. Fair stated that she warned Ms. Lightner not to sleep with Joey, to which Ms. Lightner responded "Why not?"

97. Ms. Aguirre further reported that Ms. Fair, in response to Ms. Lightner's question, stated "Because you're his boss."

<u>Ms. Lightner and Ms. Rascati Call with Mr. Buxenbaum</u>

98. Rather than conducting an investigation, independent from Ms. Lightner, Defendants permitted Ms. Lightner to actively participate in conversations with Mr. Buxenbaum.

99. After Ms. Pardue's and Ms. Aguirre's reports, Ms. Lightner texted Mr. Buxenbaum to video call her as soon as possible.

100. Upon reading Ms. Lightner's text, Mr. Buxenbaum felt stressed and anxious, because he wanted to avoid Ms. Lightner after her continued harassment at the AEMA Mining Event.

101. Mr. Buxenbaum video called Ms. Lightner.

102. When the call started, Mr. Buxenbaum saw Ms. Rascati in Ms. Lightner's office.

103. Ms. Rascati told Mr. Buxenbaum that rumors were circulating that Mr. Buxenbaum had slept with Ms. Lightner.

104. Ms. Rascati stated that she wanted to know where those rumors originated.

105. Ms. Rascati did not mention Ms. Pardue's or Ms. Aguirre's reports regarding Ms. Lightner's inappropriate touching of Mr. Buxenbaum.

106. Mr. Buxenbaum informed Ms. Rascati that he did not sleep with Ms. Lightner.

107. Mr. Buxenbaum felt very uncomfortable, because Ms. Lightner was on the video call, and was a high-ranking Tri-Taylor employee.

108. At that point, Mr. Buxenbaum had already reported Ms. Lightner's harassment to Ms. Fair, his direct supervisor, in compliance with Defendants' employee handbook; Ms. Fair had personally observed Ms. Lightner's harassment; and two employees had reported Ms. Lightner's misconduct.

109. After the video call, Defendants began collecting employee statements, regarding Mr. Buxenbaum.

110. Ms. Aguirre confirmed, in an email to Ms. Rascati and Ms. Lightner, that Mr. Buxenbaum told her that Ms. Lightner had grabbed his penis.

111. Defendants also began collecting employee statements regarding Mr. Buxenbaum's job performance in an attempt to find a purported basis to terminate his employment.

### Defendants Terminate Mr. Buxenbaum on January 15, 2020

112.   On January 15, 2020, Mr. Buxenbaum arrived to work, at the Tucson office, and saw Ms. Lightner.

113.   Ms. Lightner and Douglas Oster, Defendants' I.T. Manager, pulled Mr. Buxenbaum into a private office.

114.   Ms. Lightner, then, terminated Mr. Buxenbaum.

115.   Immediately thereafter, Ms. Lightner terminated Ms. Fair.

116.   At that point, despite having multiple reports of Ms. Lightner's misconduct, Defendants had not conducted an investigation.

### Defendants' Attorney Conducts a Purported Independent Investigation

117.   In April 2020, after his termination, Mr. Buxenbaum served Defendants with a demand letter.

118.   After receiving that demand letter, Defendants instituted a purported independent investigation into Ms. Lightner's conduct.

119.   That investigation, however, was led by Holland & Hart, Defendants' attorneys.

120.   Mr. Buxenbaum informed Holland & Hart that he was willing to be interviewed with his attorney present.

121.   Holland & Hart, however, refused to interview Mr. Buxenbaum with his attorney present.

122.   Holland & Hart, then, reported that Mr. Buxenbaum refused the interview.

123.   Holland & Hart, then, "concluded" that the allegations regarding Ms. Lightner's conduct were unfounded.

124. Holland & Hart, then, represented Defendants during EEOC proceedings, regarding Mr. Buxenbaum's claims.

## COUNT I
### SEXUAL HARASSMENT (HOSTILE WORK ENVIRONMENT) PURSUANT TO TITLE VII

125. Mr. Buxenbaum realleges and incorporates by reference the allegations contained in the previous paragraphs.

126. Mr. Buxenbaum is a member of a protected class, as defined by 42 U.S.C. § 2000e-2.

127. Ms. Lightner, as Mr. Buxenbaum's supervisor, engaged in unwelcome verbal and physical conduct of a sexual nature including: (i) touching Mr. Buxenbaum's penis; (ii) grabbing Mr. Buxenbaum's buttocks; (iii) telling Mr. Buxenbaum that he would be "better than the dildo in [her] nightstand"; (iv) holding Mr. Buxenbaum's hand, and (v) making excessive and aggressive attempts to speak with Mr. Buxenbaum.

128. Ms. Lightner's conduct was severe, pervasive, and altered the conditions of Mr. Buxenbaum's employment, creating an abusive work environment.

129. Defendants knew or should have known of Ms. Lightner's conduct, but failed to take action.

130. Mr. Buxenbaum was damaged by Ms. Lightner's actions.

## COUNT II
### SEXUAL HARASSMENT (QUID PRO QUO) PURSUANT TO TITLE VII

131. Mr. Buxenbaum realleges and incorporates by reference the allegations contained in the previous paragraphs.

132. Mr. Buxenbaum is a member of a protected class, as defined by 42 U.S.C. § 2000e-2.

133. Ms. Lightner, as Mr. Buxenbaum's supervisor, engaged in unwelcome verbal and physical conduct of a sexual nature.

134. Ms. Lightner harassed Mr. Buxenbaum on the basis of his sex.

135. Mr. Buxenbaum refused Ms. Lightner's sexual advances.

136. As a result, Defendants terminated Mr. Buxenbaum's employment.

137. Defendants knew or should have known of Ms. Lightner's conduct, but failed to take action.

## COUNT III
## RETALIATION (WRONGFUL TERMINATION) PURSUANT TO TITLE VII

138. Mr. Buxenbaum realleges and incorporates by reference the allegations contained in the previous paragraphs.

139. Mr. Buxenbaum reported Ms. Lightner's unwelcome sexual harassment to Ms. Fair, his direct supervisor, in compliance with Defendants' sexual harassment policy.

140. Ms. Lightner's advances were also reported by other employees, independently, to Ms. Rascati and Ms. Lightner.

141. Mr. Buxenbaum's supervisor knew about Ms. Lightner's inappropriate advances.

142. As a result, Defendants terminated Mr. Buxenbaum's employment.

143. A causal connection exists between Mr. Buxenbaum's refusal of Ms. Lightner's sexual advances and report of those advances, and Mr. Buxenbaum's termination.

144. Mr. Buxenbaum was damaged, because of Ms. Lightner's unlawful discrimination which resulted in her wrongful termination.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

145. Mr. Buxenbaum incorporates and realleges each and every previous allegation as though fully set forth herein.

146. Ms. Lightner acted in an extreme and outrageous manner towards Mr. Buxenbaum.

147. Defendants were also extreme and outrageous when it ignored sexual harassment claims against Ms. Lightner, and instead discharged Mr. Buxenbaum.

148. Upon information and belief, Defendants intended to cause Mr. Buxenbaum severe emotional distress or recklessly disregarded the near certainty that such distress would occur because of their actions.

149. Defendants' actions were intentional, reckless, and willful and wanton, to serve their own interests, consciously pursuing a course of conduct having reason to know and consciously disregarding a substantial risk that such conduct might significantly injure the rights of others.

150. As a direct and proximate result of the Defendants' actions, Mr. Buxenbaum sustained severe emotional distress and loss of income.

**WHEREFORE**, Mr. Buxenbaum requests the following:

i. That the Court issue an order that the Defendants' actions described herein were discriminatory and violated Title VII.

ii. Order Defendants to reinstate Mr. Buxenbaum to his former position with all benefits to which he is entitled; and

iii. That the Court enter a judgment in his favor in an amount to be determined at trial encompassing back pay, front pay, attorney's fees, costs, punitive damages, and such other amounts, including compensatory damages, as deemed appropriate.

iv. Monetary damages sufficient to fully and fairly compensate Mr. Buxenbaum for his losses, injuries and damages.

v. For attorney's fees and costs, pursuant to 42 U.S.C.A. § 2000e-5(k).

vi. Demands a jury trial to try the case, and further requests such other relief as this court deems just and proper.

DATED this 3rd day of December, 2021.

                                **GOLDSMITH & MENDOZA, PLLC**

                                By:/s/*Maria del Pilar Mendoza*
                                   Eugene N. Goldsmith
                                   Maria del Pilar Mendoza
                                   *Attorneys for Plaintiff*

## VERIFICATION

JOSEPH BUXENBAUM declares, under penalty of perjury:

1. That I am the Plaintiff, in the above-entitled cause; and

2. That I have read the foregoing Complaint and that I am familiar with the contents thereof; and that the Complaint and contents thereof are true and accurate to the best of my knowledge, information, and belief; and

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED ON this 3rd day of December, 2021.

_____
JOSEPH BUXENBAUM